

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00147-CV

———————————————

IN THE INTEREST OF M.S. AND S.S., CHILDREN

---

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-660900-19

---

Before Gabriel, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

In this private termination case, appellant C.B. (Mother) appeals the trial court's order terminating her parental rights to her children M.S. (Matthew) and S.S. (Samantha) (collectively the Children).[1] In five issues, Mother contends the evidence was legally and factually insufficient to support termination under Family Code Section 161.001(b)(1)(D) and (E), the evidence was legally and factually insufficient to support the trial court's best-interest finding, the trial court erred in assessing child support against Mother, the trial court erred in assigning child support arrears to Appellees C.C. (Mr. Clark) and M.C. (Mrs. Clark) (collectively the Clarks), and the trial court erred in awarding attorney's fees to the Clarks. Because we will hold that the evidence was legally and factually sufficient to support both the conduct grounds and the trial court's best-interest finding, and because we will hold that Mother's complaints regarding child support, child support arrears, and attorney's fees are either not preserved or lack merit, we will affirm the trial court's termination order.

## I. BACKGROUND

### A. THE CHILDREN'S 2008 REMOVAL AND SUBSEQUENT RETURN TO MOTHER

Matthew was born to Mother and M.L.S. (Father) in 2004, and Samantha was born to Mother and Father in 2005. Father had a criminal history, and by his own

---

[1]We use aliases to refer to the Children and the parties. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

account, he was "a stranger in [the Children's] lives for most of their li[ves]."[2] In 2007, the trial court entered an order naming Mother and Father joint managing conservators of the Children and designated Mother as the conservator with the right to determine the Children's primary residence.

In April 2008, the Department of Family and Protective Services (the Department) removed the Children from Mother's care and placed them with a family friend. When asked about the 2008 removal at the 2020 termination hearing, Mother stated that she could not recall whether the Children were removed in 2008 and could not recall how many times the Children had been removed by the Department.[3] Father testified that the Children were removed because of "[a]llegations of physical abuse and child neglect on behalf of [Mother]." When asked about the neglect that led to the 2008 removal, Father stated that Mother had left the Children alone in their apartment by themselves or had left them with friends or neighbors who, unable to reach Mother, left the children unattended. At the termination hearing, Mother was asked whether she had left the Children alone when they were very young, and

---

[2]The trial court terminated Father's parental rights to the Children in the same order terminating Mother's parental rights. Father does not appeal.

[3]Mother testified that she has "recall and memory issues" that impact "all domains of life." She described how she would not remember how to get to college classes that she had attended on a daily basis. She also described an incident where she was found sleeping in a faculty member's office, and she could not recall how she had arrived there. Mother attributes the memory issues as a side effect of being bipolar.

Mother mentioned leaving them alone on one occasion when she had to study for a college exam. Mother could not recall the Children's ages during that incident, nor could she recall whether it was that incident that led to the 2008 removal. Mother stated that that one incident was the only time she had left the Children alone. The Children were later returned to Mother in March 2009.

## B. THE CHILDREN'S 2011 REMOVAL, PLACEMENT WITH THE CLARKS, AND RETURN TO MOTHER

The Department again removed the Children from Mother's care in April 2011, and this time, they were placed in foster care with the Clarks and the Clarks' children. When asked about the 2011 removal at the 2020 termination hearing, Mother stated that she did not remember why the Children were removed but said it was probably due to a "housing situation." Father testified that the Children were removed in 2011 because of "physical abuse and child neglect." He stated that "[t]he main physical abuse was done to [Matthew] where [Mother] had slapped him across the face and left a handprint on one side of his face and caused damage to his eye." Mrs. Clark testified that she saw "bruises" and "marks" on Matthew's face when he was placed in her home, and she stated that Samantha told her that Mother had slapped Matthew across the face after he had gotten in trouble at school. Mother testified that she could not remember whether she had slapped Matthew. She also stated that she could not remember whether there had ever been allegations of physical abuse made against her, nor could she remember whether she had ever physically abused the

4

Children.  The Children lived with the Clarks from April 2011 until February 2012, when they were returned to Mother.

## C.  MOTHER VOLUNTARILY PLACES THE CHILDREN WITH THE CLARKS IN 2017

Around the beginning of July 2017, Mother contacted Mrs. Clark and inquired about adoption protocols.  Mother testified that she had reached out to Mrs. Clark because she was in a "[f]inancial crisis."[4]  Later in July, Mother met with Mrs. Clark, and Mrs. Clark expressed a willingness "to assist in any way that [she] could," including adopting the Children if Mother so desired.  Mother expressed to Mrs. Clark that she trusted her and believed that the Clarks had had a positive impact on the Children's lives and that the Children considered the Clarks to be "extended family." Mother also expressed that she believed the Children "would benefit from a 2-parent household with stability and structure."  The Children spent several nights in July at the Clarks' home, and they began staying there regularly soon thereafter.  Mother testified that she was not abandoning the Children but that she felt it was in the Children's best interest to live with the Clarks.  In August 2017, Mother signed a power of attorney necessary for the Children to begin attending school with the Clarks' other children.  In the ensuing months, Mother and Mrs. Clark discussed the possibility of the Clarks adopting the Children, but Mother never agreed to adoption.

---

[4]At the termination hearing, Mother testified that she had been in college for approximately fifteen years and had found it difficult to find gainful employment without a college degree.

5

Mrs. Clark testified that Mother's visits with the Children were frequent at the beginning after the Children began living with the Clarks but that Mother's visits slowed down over time. Mrs. Clark testified that the Children started to not want to visit with Mother and that sometime around the end of 2018 to the beginning of 2019, the Children began insisting that the Clarks attend the visits with them. Mother testified that she visited the Children monthly.

At the termination hearing, Mrs. Clark testified that in the two-and-a-half years that the Children had been living with her, she and her husband had been feeding the Children, clothing them, providing for their education, and taking them to the doctor and dentist.[5] Mrs. Clark testified that she and her husband loved the Children, and that they desired to adopt them. Father testified that the Children had expressed their desire to be adopted by the Clarks. Father also testified that the Children are bonded to the Clarks and that he believed that the Children are "happy[,] safe[,] and secure" at the Clarks. Mother also testified that the Children are happy with the Clarks and that they are doing well in school. She further testified that the Clarks' residence is safe and secure.

---

[5]As to the dentist, Mother testified that she was concerned that the Children were not getting the dental care they needed from the Clarks although she admitted that she had not been attending the Children's dental visits. Mrs. Clark testified that she and her husband had placed the Children on their dental insurance and that the Children received cleanings every six months as well as regular exams.

## D. FURTHER ALLEGATIONS AGAINST MOTHER AND MOTHER'S STAYS IN A PSYCHIATRIC FACILITY

At the termination hearing, Mrs. Clark testified that the Children had made outcries of abuse and neglect to her regarding incidents that had occurred sometime between when the Department returned the Children to Mother in 2012 and when the Children began living with the Clarks again. Mrs. Clark stated that Samantha had told her that she had been left for "[l]ong periods of time home alone . . . maybe a week." She averred that Samantha also told her that Mother had thrown a chair at her. Mrs. Clark also testified that Matthew told her that Mother made him "stay on the balcony overnight in his underwear for receiving a bad grade." Mother denied making Matthew stay on the balcony overnight in his underwear and denied throwing "a table or a lamp" at Samantha.

At the termination hearing, Mother also testified that she had been in a psychiatric treatment facility sometime around September 2019, although she did not know how long she was in the facility or why she was in the facility. Mother's boyfriend testified that he had taken her to the hospital in September 2019 because "she was talking a little bit off . . . a bit of nonsense" and that "she wasn't herself." He stated that Mother had been in the hospital for "a little bit more than two weeks" pursuant to a court order. Mother's boyfriend stated that she had also been in a psychiatric treatment facility for two weeks during the summer of 2018.

## E. PROCEDURAL HISTORY AND THE TRIAL COURT'S TERMINATION ORDER

In November 2018, the Clarks filed a petition to terminate Mother's and Father's parental rights to the Children.[6] In their original petition, the Clarks sought termination of Mother's parental rights based on the predicate termination grounds set forth in Subsections (B), (C), (F), and (K) of Section 161.001(b)(1) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(B), (C), (F), (K). The Clarks later amended their petition to also allege the endangerment grounds set forth in Subsections (D) and (E). *See id.* § 161.001(b)(1)(D), (E). Following the termination hearing, the trial court issued a ruling terminating Mother's parental rights to the Children under Subsections (D) and (E) and finding that such termination was in the Children's best interest. The trial court also found that $4,138.68 in child support was on hold with the Texas Attorney General's Office stemming from payments made by Father while the Clarks had possession of the Children, and the trial court assigned that money to the Clarks and ordered that it be released to them. The trial court also awarded the Clarks their attorney's fees to be paid by Mother. Mother appeals from that termination order.

---

[6]That petition was initially filed in Dallas County, but the case was eventually transferred to the 231st District Court of Tarrant County.

## II.  CONDUCT GROUNDS

In her first issue, Mother argues that the evidence was legally and factually insufficient to support termination under Family Code Section 161.001(b)(1)(D) and (E).

### A.  STANDARD OF REVIEW

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence:  1) that the parent's actions satisfy one ground listed in Family Code  Section 161.001(b)(1); and 2) that termination is in the child's best interest.  *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings—here the endangerment findings—to determine whether a reasonable fact-finder could form a firm belief or conviction that the finding is true.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).  We assume that the fact-finder settled any evidentiary conflicts in favor of its finding if a reasonable fact-finder could have done so.  *J.P.B.*, 180 S.W.3d at 573.  We

disregard all evidence that a reasonable fact-finder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *See id.* The fact-finder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the fact-finder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a fact-finder could reasonably form a firm conviction or belief that the Clarks proved the endangerment grounds. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the fact-finder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. LAW ON ENDANGERMENT

Subsections (D) and (E) of Texas Family Code Section 161.001(b)(1) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that a parent has

(D)     knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

(E)     engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection 161.001(b)(1)(D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* As an example, "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.*

Under Subsection 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not

11

necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being. *Id.* "Domestic violence, want of self[-]control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). We may consider conduct that occurred outside the child's presence in our review. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

### C. MOTHER'S ARGUMENT THAT WE SHOULD NOT CONSIDER CERTAIN OF THE ENDANGERMENT EVIDENCE BECAUSE IT IS INADMISSIBLE HEARSAY

Before we detail the endangerment evidence, we must first address arguments made by Mother that certain of the endangerment evidence constitutes inadmissible hearsay. Mother contends that Mrs. Clark's testimony regarding Mother's slapping Matthew, Mother's making Matthew spend the night on the balcony in his underwear, Mother's throwing a chair at Samantha, and Mother's making the Children spend long

12

periods of time at home alone is inadmissible hearsay. Mother also contends that Father's testimony that Mother slapped Matthew across the face is inadmissible hearsay. The Clarks counter that Mother's hearsay arguments are not preserved for our review.

## 1. The Law Regarding Preservation

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must also get a ruling—either express or implied—from the trial court. Tex. R. App. P. 33.1(a)(2)(A), (b); *see Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002). If the trial court refuses to rule, the party preserves error by objecting to that refusal. Tex. R. App. P. 33.1(a)(2)(B). If the trial court does not rule and the party does not object to the refusal to rule, error is not preserved. *Id.* Furthermore, any error in admitting evidence is deemed harmless and is waived if the objecting party later permits the same or similar evidence to be introduced without objection. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235–36 (Tex. 2007); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004).

13

## 2.  Mother Did Not Preserve Her Hearsay Complaints Regarding Mrs. Clark's Testimony

Mother argues that Mrs. Clark's testimony regarding Mother's slapping Matthew, Mother's making Matthew spend the night on the balcony in his underwear, Mother's throwing a chair at Samantha, and Mother's making the Children spend long periods of time at home alone is inadmissible hearsay.  Mother points to the following exchange:

> Q.  [By the Clarks' counsel] Did [Samantha] make any outcries of abuse to you that happened between the time CPS got out of the case in 2011 and when you and your husband got the children in 2017?
>
> A.  [Samantha] made outcries of neglect and abuse.
>
> Q.  What kind of neglect?
>
> A.  Long periods of time home alone, according to her, maybe a week.
>
> Q.  Was it -- did she say whether or not it was dark outside?
>
> A.  It was overnight.  It was several nights.
>
> Q.  And this was after CPS got out of the case?
>
> A.  Correct.
>
> Q.  And did [Matthew] make any statements as to abuse or neglect that he personally endured between 2011 and 2017?
>
> A.  Yes.
>
> Q.  And what did he say?
>
> [Mother's counsel]:  Object to hearsay.

14

[Trial Court]: If it's an outcry, it's not hearsay. Rephrase.

[The Clarks' counsel]: Do you want me to rephrase?

[Trial Court]: Not that what you said, but --

[The Clarks' counsel]: I was pretty --

Q. [By Clarks' counsel] Did [Matthew] make any outcries of abuse between -- that occurred between 2011 when CPS closed their second case and when you got the children?

A. [Matthew] said that he was made to stay on the balcony overnight in his underwear for receiving a bad grade.

. . .

Q. Did either of the children make allegations of physical abuse, outcries of physical abuse?

A. [Samantha] did.

Q. And what did she say?

A. She said that a chair was thrown at her.

Q. And who threw the chair.

A. [Mother].

Q. Did the children make any outcries of physical abuse or neglect for the periods that they were in foster care, the 2011 case?

A. About?

Q. Outcries of any abuse, as to why they came into care in 2011.

A. [Matthew] did not really discuss it. [Samantha] told me how [Matthew] received the bruises on his face.

15

Q. Which are the -- would that be the same bruises that [Father] testified --

A. Yes.

Q. -- that the CPS case was about?

A. Yes.

Q. And what was [Samantha's] outcry as to how [Matthew] received the bruises on his face?

A. That he got in trouble for bad behavior at school and that [Mother] slapped him across the face.

Q. That she --

A. Slapped him across the face.

Q. Were there any outcries as to whether or not the slap across the face left marks?

A. We saw the marks.

Q. Oh, because the children were placed with you?

A. Correct.

Mother contends that the trial court's statement of "[i]f it's an outcry, it's not hearsay[,] [r]ephrase," to the sole objection lodged in the above excerpt somehow preserved Mother's hearsay argument on appeal as to the entire excerpt. We disagree. Mother's objection was lodged to the question, "And what did [Matthew] say?" Rather than ruling on that objection, the trial court asked the Clarks' counsel to rephrase the question. The Clarks' counsel then rephrased the question and asked about specific instances of abuse, and Mother did not object to any of the questions

16

pertaining to those specific instances. Mrs. Clark thus testified—without objection—regarding Mother's slapping Matthew, Mother's making Matthew spend the night on the balcony in his underwear, Mother's throwing a chair at Samantha, and Mother's making the Children spend long periods home alone. Because Mother did not object to this testimony, Mother's hearsay complaint is not preserved. *See* Tex. R. App. P. 33.1(a)(1)(A); *Bushell*, 803 S.W.2d at 712. Accordingly, we may consider this evidence in our review. *See* Tex. R. Evid. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay.").

### 3. Mother Did Not Preserve Her Hearsay Complaint Regarding Father's Testimony

Mother also argues that Father's testimony that Mother slapped Matthew across the face was inadmissible hearsay and should not be considered in our review. Mother points to the following exchange during the Clarks' direct examination of Father:

> Q. And what reason were your children brought into foster care in 2011?
>
> A. The same ones, physical abuse and child neglect.
>
> Q. Do you have any specifics on the physical abuse?
>
> A. The main physical abuse was done to [Matthew] where [Mother] had slapped him across the face and left a handprint on one side of his face and caused damage to his eye.
>
> [Mother's counsel]: I'm gonna object to hearsay.
>
> . . . .

17

[Trial Court]: I'm gonna overrule that objection just for purposes of the record.

Even if we assumed that Mother's objection—which occurred after Father gave his answer—was timely, Mother has waived any complaint regarding Father's testimony because, as mentioned above, Mrs. Clark testified—without objection—that Samantha had told her that Mother had slapped Matthew across the face after he got in trouble at school. Mrs. Clark then described—again without objection—how Mother's slap had left "marks" and "bruises" on Matthew's face. Because evidence relating to the slap was later admitted without objection, Mother has waived her hearsay complaint regarding Father's testimony relating to the slap. *See Bay Area Healthcare Grp.*, 239 S.W.3d at 235–36; *Volkswagen of Am.*, 159 S.W.3d at 907. Accordingly, we may consider this evidence in our review. *See* Tex. R. Evid. 802.

## D. ENDANGERMENT ANALYSIS

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review. *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

Here, the record contains evidence that the Children were twice removed from Mother's care. The record reflects that the Children were first removed in April 2008 and not returned to Mother until March 2009. While Mother could not recall the 2008 removal, Father testified that the Children were removed because Mother had

18

left the Children alone in their apartment by themselves or had left them with friends or neighbors who, unable to reach Mother, left the children unattended. Mother admitted that she had left the Children alone on one occasion when she had to study for a college exam although she could not recall whether it was that incident that led to the 2008 removal.

The record reflects that the Children were removed from Mother's care again in April 2011 and not returned to Mother until February 2012. While Mother could not remember why the Children were removed in 2011 and guessed that it was due to a "housing situation," Father testified that the Children were removed because "Mother had slapped [Matthew] across the face and left a handprint on one side of his face and caused damage to his eye." Mrs. Clark, who became a foster parent to the Children following the 2011 removal, testified that she had seen "marks" and "bruises" on Matthew's face and that Samantha had told her that Mother had slapped Matthew across the face after he had gotten in trouble at school. Mother testified that she could not remember whether she had slapped Matthew and could not remember whether she had ever physically abused the Children.

The record also contained evidence that the Children had made outcries of abuse and neglect to Mrs. Clark regarding incidents that had occurred sometime between when the Department returned the Children to Mother following the 2011 removal and when the Children began living with the Clarks again in 2017. The evidence reflects that Samantha told Mrs. Clark that she had been left for "[l]ong

19

periods of time home alone[,] . . . maybe a week" or at least "several nights." The evidence further reflects that Samantha told Mrs. Clark that Mother had thrown a chair at her.[7] The record also reflects that Matthew told Mrs. Clark that Mother had made him "stay on the balcony overnight in his underwear for receiving a bad grade" although Mother denied that that incident had occurred.

Finally, the record reflects that Mother had a compromised mental state. Mother testified that she is bipolar and that she has "recall and memory issues" as a side effect that impact "all domains of life." At the termination hearing, Mother could not recall seemingly important facts—such as whether the Children had been removed in 2008, how many times the Children had been removed, whether she had slapped Matthew across the face, whether there had ever been allegations of physical abuse made against her, and whether she had ever physically abused the Children. Mother also stated that at times she could not remember how to get to her college classes that she had been attending on a daily basis, and she described an incident where she was found sleeping in a faculty member's office and could not recall how she had arrived there. The record also reflects that Mother had multiple stays in a psychiatric treatment facility in the two years prior to the termination hearing. She testified that she had been in a psychiatric treatment facility in September 2019, although she stated that she did not know how long she was in the facility or why she

_____

[7]Mother denied ever throwing "a table or a lamp" at Samantha.

20

was there. Mother's boyfriend testified that he had taken her to the facility in September 2019 because "she was talking a little bit off . . . a bit of nonsense" and that "she wasn't herself." He also stated that she had been in the facility for over two weeks pursuant to a court order. Mother's boyfriend further testified that Mother had been in a psychiatric treatment facility for two weeks during the summer of 2018.

Mother contends that this evidence, at best, amounts to "isolated event[s], not a course of conduct." We disagree. The record reflects evidence of abuse directed against the Children by Mother both before and after the 2011 removal (two of which occurred after something negative happened with respect to Matthew's schooling), and it further reflects a pattern of disregard for the Children's physical and emotional well-being both before and after the 2008 and 2011 removals. Each of these was not a one-off incident. We further reject Mother's argument that the outcry testimony should be doubted because of the cordial[8] relations between Mother and the Clarks and because the Clarks did not report the alleged abuse to authorities; such an argument goes to the witnesses' credibility and demeanor, of which the fact-finder is the sole judge. *See J.O.A.*, 283 S.W.3d at 346. We also reject Mother's argument that the endangerment evidence pertained to events in the "distant past." "A parent's past

---

[8]As gleaned from the record, the relationship between Mother and the Clarks was largely cordial and friendly. Mrs. Clark would often offer words of encouragement to Mother regarding the Children, Mother's schooling, and Mother's finances, and on several occasions, Mrs. Clark invited Mother to participate in the Clarks' lives and the Children's lives.

21

endangering conduct may support an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *See In re M.P.B.*, No. 01-19-00973-CV, 2020 WL 3525447, at *8 (Tex. App.—Houston [1st Dist.] June 30, 2020, pet. denied) (mem. op.). Nothing in the record indicates that Mother's past will remain there; to the contrary, the record reflects evidence of endangerment at several points along Mother's and the Children's journey—in 2008, in 2011, and in the years between 2011 and 2017.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the fact-finder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable fact-finder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed the Children to remain in conditions or surroundings that had endangered their emotional or physical well-being and that there is some evidence of endangering conduct on which a reasonable fact-finder could have formed a firm belief or conviction that Mother had engaged in conduct that had endangered the Children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Giving due deference to the fact-finder's endangering-environment and endangering-conduct findings, without supplanting the fact-finder's judgment with our own, and after reviewing the entire record, we hold that a fact-finder could reasonably form a firm conviction or belief that Mother had knowingly placed or had

22

knowingly allowed the Children to remain in conditions or surroundings that had endangered their emotional or physical well-being and that Mother had engaged in conduct that had endangered the Children's physical or emotional well-being. *See Id.* § 161.001(b)(1)(D), (E).

We overrule Mother's first issue.

### III. BEST INTEREST

In her second issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's best-interest finding.

#### A. STANDARD OF REVIEW AND BEST-INTEREST FACTORS

We review Mother's challenge to the sufficiency of the trial court's best-interest finding under the review standards stated regarding the conduct grounds. In determining whether to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *E.C.R.*, 402 S.W.3d at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the fact-finder may apply in determining the child's best interest:

23

(A)     the child's desires;

(B)     the child's emotional and physical needs, now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the child's best interest;

(F)     the plans for the child by these individuals;

(G)     the stability of the home or proposed placement;

(H)     the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

24

## B. BEST-INTEREST ANALYSIS

With regard to the Children's desires, the record reflects that they have bonded to the Clarks, are happy living with the Clarks, and desire to be adopted by the Clarks. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to the Children.[9]

With regard to the Children's emotional and physical needs now and in the future and the emotional and physical danger to them now and in the future, the record reflects that the Children are endangered in Mother's care (as detailed in the endangerment evidence above). In contrast to the evidence that the Children are endangered while in Mother's care, the record reflects that they are well cared for in the Clarks' care. Mother herself acknowledged that the Children are happy, safe, and stable with the Clarks. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to the Children.

With regard to the plan for the Children by the individuals seeking custody and the stability of the home or proposed placement, the record reflects that Mother was unemployed at the time of the termination hearing and had last worked approximately eight months before the hearing. Mother further testified that she had "zero" dollars

---

[9]In her brief, Mother acknowledges that this factor weighs "slightly in favor of termination."

in her bank account and that her boyfriend paid the majority of her bills.[10] Mother stated that she was living in a one-bedroom apartment, that her plan if the children were returned to her was to have the Children sleep in the bedroom while she slept on the couch, and that the Children would need to change schools. The record further reflects that the Children led unstable lives while in Mother's care: twice the Children were removed by the Department for lengthy periods, and in 2017, Mother voluntarily placed the Children with the Clarks. The record also reflects that Mother had multiple stays in a psychiatric treatment facility in the two years prior to the termination hearing, and by her own admission, she suffers from "recall and memory issues" that impact "all domains of life." In contrast, the record reflects that the Clarks had been feeding the Children, clothing them, providing for their education, and providing for their medical and dental care since the Children's placement with them. Father testified that the Children were "happy[,] safe[,] and secure" at the Clarks, and Mother testified that the Children were happy and doing well in school and that the Clarks' residence is safe and secure. The record further reflects that the Clarks desire to adopt the Children and that the Children desire to by adopted by the Clarks. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to the Children.

---

[10]The record did contain evidence that Mother had purchased Matthew clothes on one occasion and had purchased the Children's school supplies on another occasion while they were living with the Clarks. Mrs. Clark further testified that Mother provided the Children with cell phones and paid the bill.

With regard to Mother's acts or omissions indicating that the existing parent–child relationship is not a proper one and any excuse for Mother's acts or omissions, the record reflects that the Children were removed in 2008 following an incident where the Children were left unattended. The Children were later removed in 2011 following an incident where Mother slapped Matthew across the face. Mother did not offer any excuse regarding those removals but instead stated that she did not remember the 2008 removal and did not recall whether she had ever slapped Matthew in the face. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to the Children.

## C. BEST-INTEREST CONCLUSION

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable fact-finder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and the Children was in the Children's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the fact-finder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's second issue.

27

## IV.  MOTHER'S ATTACK ON THE TRIAL COURT'S JULY 26, 2019 TEMPORARY ORDER REQUIRING HER TO PAY CHILD SUPPORT

In her third issue, Mother complains about the trial court's July 26, 2019 temporary order in which she was required to pay monthly child support of $657.25. Mother asks us to remand the case to the trial court so that it can recalculate the amount of support to be paid under that temporary order.  Temporary orders that are issued in a suit affecting the parent–child relationship are not appealable.  *Interest of L.A.*, No. 02-16-00403-CV, 2017 WL 1289362, at \*5 (Tex. App.—Fort Worth Apr. 6, 2017, no pet.) (mem. op.); *In re J.W.L.*, 291 S.W.3d 79, 83 (Tex. App.—Fort Worth 2009, orig. proceeding).  Mother's complaint is an attempt to appeal a temporary order in a suit affecting the parent–child relationship, a complaint that we do not have jurisdiction to consider.  *See Interest of N.V.R.*, 580 S.W.3d 220, 225 (Tex. App.—Tyler 2019, pet. denied) (mem. op.) ("[T]his complaint relates to the February 2017 temporary child support order.  Runnels did not challenge this order in a mandamus proceeding[,] and it cannot now be challenged on appeal from the trial court's subsequent assessment of arrearages."); *L.A.*, 2017 WL 1289362, at \*5 ("Mother's complaint is an attempt to appeal the temporary orders issued by the trial court on October 15, 2015, a complaint which we do not have jurisdiction to consider.").  We overrule Mother's third issue.

## V. MOTHER'S COMPLAINT REGARDING ALLEGED CHILD SUPPORT ARREARS

In her fourth issue, Mother argues that the trial court erred by assigning child support arrears to the Clarks. Mother contends that a trial court has "very limited" discretion with respect to child support arrears, that a trial court is to "ac[t] as a mere scrivener in mechanically tallying up the amount of arrearage," and that the trial court allegedly did not do so here. *See Chenault v. Banks*, 296 S.W.3d 186, 189 (Tex. App.—Houston [14th Dist.] 2009, no pet.). As pointed out by the Clarks in their brief, however, the trial court did not assign them child support arrears. Instead, the record reflects that the trial court found that $4,138.68 in child support was on hold with the Texas Attorney General's Office stemming from child support payments made by Father. The trial court found that this amount had accumulated while the Clarks had primary possession of the Children.[11] The trial court assigned the $4,138.68 that was on hold to the Clarks and ordered the Texas Attorney General's Office to release it to them. We thus reject Mother's contention that the trial court somehow erred by assigning the Clarks child support arrears.[12] To the extent that Mother is attempting to argue something else with respect to the $4,138.68, such an argument is

[11]A payment-record printout from the Texas Attorney General's Office was admitted into evidence and reflected that Father made fifty-two payments of $197.08 (totaling $10,248.16) between July 31, 2017, and July 15, 2019.

[12]Arrears refer to amounts that are past due; here, there are no findings or evidence that the amounts assigned to the Clarks were past due. We thus find that the authorities cited by Mother pertaining to arrears are inapposite.

inadequately briefed. *See* Tex. R. App. P. 38.1(i); *Sanders v. Future Com, Ltd.*, No. 02-15-00077-CV, 2017 WL 2180706, at *7 (Tex. App.—Fort Worth May 18, 2017, no pet.) (mem. op.) ("This court shall not resort to speculation or surmise to make [an appellant's] argument for him."). We overrule Mother's fourth issue.

## VI. SEGREGATION OF ATTORNEY'S FEES

In her fifth issue, Mother argues that the trial court erred by awarding attorney's fees to the Clarks despite the Clarks' failure to segregate attorney's fees between the relief sought against Mother and Father and between the various conduct-ground theories sought against Mother. But Mother did not make these arguments in the trial court. Because Mother asserts her segregation complaints for the first time on appeal, she has waived them. *See* Tex. R. App. P. 33.1; *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988) (holding that party opposing award of attorney's fees must object to failure to segregate fees in order to preserve the issue for appellate review); *Fritts v. McDowell*, No. 02-16-00373-CV, 2017 WL 3821889, at *8 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (mem. op.) (same); *In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, at *15 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (same). We overrule Mother's fifth issue.

## VII. CONCLUSION

Having overruled Mother's five issues, we affirm the trial court's termination order.

30

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  October 15, 2020